Slip Op. 15- 134

## UNITED STATES COURT OF INTERNATIONAL TRADE

ETHAN ALLEN OPERATIONS, INC.,

Plaintiff,

ASHLEY FURNITURE INDUSTRIES, INC., HOME MERIDIAN INTERNATIONAL, INC., CITY FURNITURE, INC., HOOKER FURNITURE CORPORATION, and STEIN WORLD OPERATING COMPANY,

Plaintiff-Intervenors,

v.

UNITED STATES,

Defendant,

AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COMPANY, INC.,

Defendant-Intervenors.

Before: Jane A. Restani, Judge

Court No. 14-00147

## OPINION

[Commerce's scope determination and remand results are remanded.]

Dated: December 1, 2015

Yohai Baisburd, Dentons US LLP, of Washington, DC, argued for plaintiff. With him on the brief were Daniel Morris, Dentons US LLP, of Washington, DC, and Gregory J. Spak, White & Case, LLP, of Washington, DC.

Kristin H. Mowry, Daniel R. Wilson, Jeffrey S. Grimson, Jill A. Cramer, and Sarah M. Wyss, Mowry & Grimson, PLLC, of Washington, DC for plaintiff-intervenors.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were Benjamin C. Mizer, Principal Deputy Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Scott D. McBride, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

J. Michael Taylor, King & Spalding, LLP, of Washington, DC, argued for defendant-intervenors.  With him on the brief were Joseph W. Dorn and Daniel L. Schneiderman.

Restani, Judge:  This matter is before the court on plaintiff Ethan Allen Operations, Inc.'s ("Ethan Allen") motion for judgment upon the agency record pursuant to USCIT Rule 56.2.  See Mem. of P. & A. in Supp. of Pl. Ethan Allen Operations, Inc.'s CIT Rule 56.2 Mot. for J. on the Agency R., ECF No. 29-2 ("Ethan Allen Br.").  Ethan Allen challenges the United States Department of Commerce's ("Commerce") determination that certain chests imported by Ethan Allen fall within the antidumping duty order covering certain wooden bedroom furniture ("WBF") from the People's Republic of China ("PRC").  Id. at 11; see Commerce's Scope Ruling on Ethan Allen Operations Inc.'s Chests, PD 14 (May 27, 2014) ("Scope Ruling"); Final Results of Voluntary Redetermination Pursuant to Court Order, ECF No. 24 ("Remand Results").  Ethan Allen additionally challenges Commerce's instructions to U.S. Customs and Border Protection ("Customs") to "continue" to suspend liquidation of entries of the four chests.  Ethan Allen Br. at 11–12.  For the reasons stated below, Commerce's Scope Ruling and Remand Results are remanded.

## BACKGROUND

Commerce issued an antidumping duty order on certain WBF from the PRC in January 2005.  See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order:  Wooden Bedroom Furniture from the People's Republic of China, 70

Fed. Reg. 329, 329 (Dep't Commerce Jan. 4, 2005) ("WBF Order").  The scope of the order

described the covered merchandise as follows:

> The product covered by the order is wooden bedroom furniture.  Wooden
> bedroom furniture is generally, but not exclusively, designed, manufactured, and
> offered for sale in coordinated groups, or bedrooms, in which all of the individual
> pieces are of approximately the same style and approximately the same material
> and/or finish.  The subject merchandise is made substantially of wood
> products . . . .

Id. at 332.  The WBF Order stated that the subject merchandise included the following items:

> (1) Wooden beds such as loft beds, bunk beds, and other beds; (2) wooden
> headboards for beds (whether stand-alone or attached to side rails), wooden
> footboards for beds, wooden side rails for beds, and wooden canopies for beds;
> (3) night tables, night stands, dressers, commodes, bureaus, mule chests,
> gentlemen's chests, bachelor's chests, lingerie chests, wardrobes, vanities,
> chessers, chifforobes, and wardrobe-type cabinets; (4) dressers with framed glass
> mirrors that are attached to, incorporated in, sit on, or hang over the dresser;
> (5) chests-on-chests, highboys, lowboys, chests of drawers, chests, door chests,
> chiffoniers, hutches, and armoires; (6) desks, computer stands, filing cabinets,
> book cases, or writing tables that are attached to or incorporated in the subject
> merchandise; and (7) other bedroom furniture consistent with the above list.

Id. (footnotes omitted).  The WBF Order defined a "chest of drawers" as "typically a case

containing drawers for storing clothing."  Id. at 332 n.4.  The WBF Order also contained a

lengthy list of items that were specifically excluded from the scope of the order, including "other

non-bedroom furniture, such as television cabinets, cocktail tables, end tables, occasional tables,

wall systems, book cases, and entertainment systems."  Id. at 332–33.

On February 19, 2014, Ethan Allen filed a scope ruling request, asking that Commerce

determine that four models of wooden chests imported by Ethan Allen from the PRC are outside

the scope of the WBF Order.  Scope Ruling Request at 1, PD 1 (Feb. 19, 2014).  Ethan Allen

described the four models as follows:

- **Vivica Chest.**  The Vivica Chest is designed, manufactured and marketed for
  use in a living room or hallway setting, and is part of a three piece living room

group consisting of a coffee table . . . and a sofa table . . . all of which share common design elements, such as antiquated mirrored glass surfaces, angled framing and wood molded top frames with distinctive mitered molding surrounding the top. . . .

- **The Nadine Chest.** The Nadine Chest is a "stand alone" accent piece, designed and marketed by Ethan Allen for use in a living room or hallway setting, and predominantly marketed in such settings. . . .

- **The Marlene Chest.** The Marlene Chest is a "stand alone" accent piece, designed and marketed for use in a living room, hallway or dining room setting. . . .

- **The Serpentine Chest.** The Serpentine Chest is a "stand alone" accent piece, designed and marketed for use in a living room, hallway or dining room setting rather than in a bedroom. . . .

Id. at 2–3.  Ethan Allen further explained that none of the chests "is of the same style, material and/or finish as any coordinated bedroom group designed, manufactured or offered for sale by Ethan Allen."  Id. at 3.  Ethan Allen argued that the chests were outside of the order because they were not designed, manufactured, or offered for sale in coordinated bedroom sets in which all of the individual pieces of furniture are approximately the same style, finish, and/or material.  See id. at 3–6.  On March 11, 2014, defendant-intervenors American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc. (collectively "AFMC") filed a letter with Commerce stating that they had no objection to Commerce finding the four chests to be outside of the scope of the WBF Order.  AFMC's Comments on Ethan Allen's Scope Ruling Request at 1, PD 5 (Mar. 11, 2014).

On April 15, 2014, Commerce placed on the record pictures from Ethan Allen's website that displayed the Vivica sofa table—one piece from the three-part Vivica coordinated living room set that includes the Vivica chest—in a bedroom setting.  Information from Ethan Allen's Website at Attach. 1, PD 9 (Apr. 15, 2014).  Ethan Allen responded that that particular picture

came from Ethan Allen's New Eclecticism campaign, in which the company promotes the

versatility of furniture and encourages consumers to use pieces of furniture in different rooms

from the rooms for which the piece was originally designed.  Letter Re:  Ethan Allen's Chests at

2–4, PD 10 (Apr. 17, 2014).

In its Scope Ruling, Commerce determined that for all four chests "the fundamental

elements of their design and dimensions . . . is entirely consistent with chests of drawers subject

to the WBF Order."  Scope Ruling at 6.  In making this determination, Commerce analyzed the

Marlene, Nadine, and Serpentine chests separately from the Vivica chest.  Id. at 7.  Commerce

did so because Ethan Allen supposedly had argued that the first three chests had wooden finishes

similar to that of bedroom furniture, but were sold as stand-alone accent pieces, whereas the

Vivica chest had a mirrored surface and was marketed as part of a coordinated living room

group.  Id.  Commerce concluded that these distinctions were relevant under the text of the WBF

Order and warranted a separate analysis of the Vivica chest.  Id.

Commerce concluded that the Marlene, Nadine, and Serpentine chests were covered by

the WBF Order after analyzing the criteria listed in 19 C.F.R. § 351.225(k)(1) (2014) ("(k)(1)

factors").  Id. at 8–9.  Commerce reasoned that although the chests contained certain decorative

aspects, they were made substantially of wood and that "the fundamental elements of their

design and dimensions—three or four parallel horizontal drawers stacked one above another in a

frame, providing, . . . adequate storage space for clothing—is entirely consistent with chests of

drawers subject to the WBF Order."  Scope Ruling at 6.  Commerce explained that because of

the "generally, but not exclusively" language of the scope and as evidenced by prior scope

rulings, the chests did not have to be designed, manufactured, and sold as part of a coordinated

bedroom in order to be covered by the order.  Id. at 7–8.  Commerce noted that the scope

specifically identified wooden chests and chests of drawers as within the scope of the order, and

that the Marlene, Nadine, and Serpentine chests were "physically consistent with chests of

drawers and similar items of wooden bedroom furniture identified in the scope." Id. at 8.

Commerce concluded that the Vivica chest was covered by the order after analyzing the

criteria listed in 19 C.F.R. § 351.225(k)(2) ("(k)(2) factors"). Commerce concluded that an

analysis of the (k)(2) factors was necessary because the sources listed in the (k)(1) factors,

specifically the International Trade Commission's ("Commission") investigation and

Commerce's prior scope determinations, "do not contain sufficient information to determine

whether a chest designed, manufactured, and marketed as part of a living room set . . . should be

considered subject to the WBF Order." Id. at 10. Commerce ultimately concluded, under the

(k)(2) factors, that the physical characteristics, ultimate use, and customer expectations weighed

in favor of the Vivica chest falling within the scope of the WBF Order, and determined that the

channels of trade and advertising factors did not point strongly one way or the other. See id. at

10–14. Commerce therefore determined that, based on the weight of the evidence, the Vivica

chest was within the scope of the order. Id.

On June 5, 2014, Commerce instructed Customs to continue to suspend liquidation of

entries of the four chests. Customs Instructions Message No. 4156302, ECF No. 46. Ethan

Allen subsequently filed a complaint, challenging Commerce's ruling that the four chests fall

within the scope of the WBF Order, Commerce's reliance on the (k)(2) factors in deciding

whether the Vivica chest is within the scope of the WBF Order without initiating a proper scope

inquiry, and Commerce's instructions to Customs to "continue" to suspend liquidation. Compl.,

ECF No. 8. Shortly thereafter, the court granted defendant the United States's ("the

government") consent motion for a remand so that Commerce could perform a scope inquiry

regarding the Vivica chest in accordance with the procedures established by Commerce's

regulations for conducting an analysis pursuant to 19 C.F.R. § 351.225(k)(2).  See Order on

Consent Mot. to Remand, ECF No. 22; see also 19 C.F.R. § 351.225(e)–(f).

During the remand proceedings, Commerce placed five images taken from Ethan Allen's

Facebook page showing the Vivica chest in three bedroom settings on the record.  Remand

Results at 3.  No party commented on this evidence.  Id.  Commerce issued its Remand Results

on November 26, 2014, again determining that the Vivica chest was within the scope of the WBF

Order, indicating that all five (k)(2) factors weighed in favor of including the Vivica chest within

the scope.  See id. at 26–27.  Commerce again determined that the Vivica chest "is a chest of

drawers and has a design consistent with bedroom chests that serve as storage for clothing."  Id.

at 10.  Commerce cited the images from the Facebook page as supporting its conclusion,

explaining that the images were relevant to the marketing and advertising of the Vivica chest, as

well as customer expectations and ultimate use.  See id. at 22–26.  Commerce also rejected

arguments that it had violated its regulations by retroactively suspending liquidation of the four

chests when it instructed Customs to "continue" suspending liquidation of entries of the chests.

See id. at 15–19.

Before the court, Ethan Allen challenges Commerce's determinations pursuant to the

(k)(1) factors that the Marlene, Nadine, and Serpentine chests are covered by the WBF Order,

Commerce's determination pursuant to the (k)(2) factors that the Vivica chest is covered by the

WBF Order, and Commerce's instructions to Customs to "continue" to suspend liquidation of

entries of the four chests.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction over Ethan Allen's challenge regarding the merits of the Scope Ruling and Remand Results pursuant to 28 U.S.C. § 1581(c) (2012).  In ruling on these challenges, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

**I.      Legal Background**

In determining whether a particular product falls within the scope of an antidumping duty order, Commerce employs a sequential analysis.  At the outset, Commerce analyzes the language of the order itself.  Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1302 (Fed. Cir. 2013).  The regulations recognize that the language of an order may be ambiguous because "the description of subject merchandise contained in [the scope of an antidumping duty order] must be written in general terms."  19 C.F.R. § 351.225(a).  If the language of the order is ambiguous with regard to the particular product at issue, then Commerce considers the (k)(1) factors, which include "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the Commission."  Id. § 351.225(k)(1).  "When the above criteria are not dispositive," only then will Commerce consider the (k)(2) factors, which are "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed."  Id. § 351.225(k)(2).

In reviewing Commerce's scope determinations, "the court will not re-weigh the evidence presented to Commerce" and will uphold decisions by Commerce when the agency "chooses from among the range of possible reasonable conclusions based on the record." OTR Wheel Eng'g v. United States, 901 F. Supp. 2d 1375, 1380 (CIT 2013).  Although the court grants significant deference to Commerce's interpretation of its own orders, Commerce "cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms."  See Walgreen Co. v. United States, 620 F.3d 1350, 1354 (Fed. Cir. 2010) (quoting Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1095 (Fed. Cir. 2002)).

## II.      The Marlene, Nadine, and Serpentine Chests

Ethan Allen argues that none of the three chests satisfies the supposed threshold requirements for WBF, namely that they be (1) designed, (2) manufactured, and (3) offered for sale in coordinated bedroom groups.  Ethan Allen Br. at 16–20.  Ethan Allen contends the three chests are non-subject merchandise because only furniture pieces that are "intrinsically and immutably bedroom furniture," such as beds, can be within the scope of the WBF Order when designed, manufactured, or offered for sale as a stand-alone piece.  See id. at 17–18.  Ethan Allen also argues that Commerce misstated record evidence when it determined that the Marlene, Nadine, and Serpentine chests should be treated differently from the Vivica Chest and that Commerce failed to consider record evidence that the three chests were not of the same style, material, and/or finish as any of Ethan Allen's coordinated bedroom groups.[1]  Id. at 15–16.

---

[1] The court agrees with Ethan Allen that Commerce misstated certain pieces of record evidence. Commerce's decision to evaluate the Vivica chest separately, however, was reasonable because

(continued . . .)

Finally, Ethan Allen argues that Commerce unlawfully evaluated a (k)(2) factor—the ultimate

use of the product—when conducting a (k)(1) analysis.  Id. at 20–22.[2]

In response, the government argues that Commerce properly concluded that the Marlene,

Nadine, and Serpentine chests are within the scope of the WBF Order pursuant to the (k)(1)

factors.  Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R. 11–19, ECF No. 35 ("Gov.

Br.").  The government contends that Commerce reasonably interpreted the scope of the WBF

Order to include stand-alone pieces, even if they are not "intrinsically" bedroom furniture.  Id. at

13–19.  The government also points to language within the WBF Order describing covered

"chests of drawers" and "chests" as pieces "for storing clothing" and asserts that Commerce's

analysis of the dimensions of the drawers and whether they were adequate for storing clothing

was consistent with this language.  Id. at 11–12.  The government further emphasizes that the

Marlene, Nadine, and Serpentine do not have any unique physical or decorative features that

distinguish them from subject bedroom chests.  Id. at 16–17.

---

the Vivica chest is part of a coordinated living room set.  Accordingly, the court continues to
analyze the Vivica chest separately.

[2]  In response to Ethan Allen's argument, the government contends that Commerce's inquiry into
whether the chests could store clothing was based on the plain language of the order, not a
consideration of any (k)(2) factor.  Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R.
12–13, ECF No. 35 ("Gov. Br.").  AFMC understands Commerce to have considered the chests'
suitability for storing clothing as part of a broader analysis under (k)(1) instead of treating it as a
dispositive factor, see AFMC's Resp. in Opp'n to Ethan Allen's Rule 56.2 Mot. for J. on the
Agency R. 13, ECF No. 37 ("AFMC Br."), but recognizes that whether some chests are designed
for the purposes of storing clothing may require an additional analysis of the (k)(2) factors, see
id. at 14.  Ethan Allen is correct that Commerce improperly considered a (k)(2) factor in its
(k)(1) analysis.  The court, when analyzing the WBF Order, has previously determined that
"purpose or use cannot be the test when conducting a § 351.225(k)(1) determination, as for
[WBF], they are factors relevant only to a § 351.225(k)(2) inquiry."  Toys "R" Us, Inc. v. United
States, 32 CIT 814, 819 (2008).  Therefore, although a broad purpose when it is an essential part
of the scope definition (e.g., for use in a bedroom) may be considered, here Commerce should
have avoided considering purpose and use when re-conducting its (k)(1) analysis.

AFMC agrees with the government that stand-alone chests may be included within the scope of the <u>WBF Order</u>. <u>See</u> AFMC's Resp. in Opp'n to Ethan Allen's Rule 56.2 Mot. for J. on the Agency R. 8–13, ECF No. 37 ("AFMC Br."). AFMC also argues that although the ability to hold clothing is a relevant factor (and not a dispositive factor) in Commerce's analysis, the proper inquiry should be the intended function of the product. <u>Id.</u> at 13–14.

The <u>WBF Order</u> does not exclude stand-alone pieces from the scope of the order. The court has previously recognized that stand-alone pieces of furniture may be included in the scope of the <u>WBF Order</u> because the order explicitly indicates that the furniture is "generally, <u>but not exclusively</u>, . . . offered for sale in coordinated groups." <u>WBF Order</u>, 70 Fed. Reg. at 332 (emphasis added); <u>see, e.g.</u>, <u>Acme Furniture Indus., Inc. v. United States</u>, 825 F. Supp. 2d 1353, 1356 (CIT 2012). Ethan Allen's argument improperly conflates two separate issues: whether a stand-alone piece may be included in the <u>WBF Order</u> and whether the merchandise at issue must be <u>bedroom</u> furniture to be included in the scope of the <u>WBF Order</u>. <u>See</u> Ethan Allen Br. at 17. The answer to both questions is yes. The text of the <u>WBF Order</u> does not bear any requirement that stand-alone pieces of furniture may be included within the order only if they are "intrinsically and immutably bedroom furniture." <u>See</u> Ethan Allen Br. at 17. Under that interpretation, many pieces of stand-alone furniture (e.g., chests, desks, book cases, armoires) could never be included in the scope of the <u>WBF Order</u> because, as a stand-alone piece of furniture, these pieces are not "intrinsically" or "immutably" bedroom furniture. Instead, the <u>WBF Order</u> can only include <u>bedroom</u> furniture, regardless of whether the item is stand-alone or sold in a coordinated set. As discussed below, however, the "generally, but not exclusively" exception language is to be construed narrowly.

In looking to the language of the <u>WBF Order</u> itself, Commerce's determination that the

(k)(1) factors are dispositive and that the three chests are within the scope of the <u>WBF Order</u> is

not supported by substantial record evidence.  Commerce relies on the claim "that the Marlene,

Nadine, and Serpentine chests have wooden finishes similar to that of bedroom furniture" to

evaluate these three accent chests separately from the Vivica chest, but this statement is

incorrect.  <u>See</u> <u>Scope Ruling</u> at 7.  Although Commerce alleges that Ethan Allen made this

argument, <u>id.</u>, Ethan Allen made precisely the opposite argument, <u>see</u> Scope Ruling Request at 7.

As discussed below, all three of the chests have unique, decorative features, and there is no

evidence on the record that these decorative features match that of other bedroom furniture sold

by Ethan Allen.  <u>Id.</u> at Ex.1 (providing the declaration of Corey Whitely, which describes the

unique decorative features of each chest).  Commerce's misstatement of the record was central to

its analysis and provides a sufficient reason to remand this decision to the agency for

reconsideration.

Furthermore, the description in the petition does not support Commerce's conclusion that

the (k)(1) factors are dispositive.  The petition recognizes a difference between wooden bedroom

chests and wooden living room chests, noting that "[l]iving room chests are usually much more

decorative . . . and are typically not as deep as bedroom chests (because the primary purpose of

bedroom chests, unlike living room chests, is for storage)."  AFMC's Resp. to Ct.'s Req. 5, ECF

No. 50 (hereinafter "WBF" Petition" at 21).  Commerce ultimately concluded, without providing

explanation, that the three chests "do not have any unique physical or decorative characteristics

that distinguish them from subject bedroom chests."  <u>Scope Ruling</u> at 8; <u>see also</u> Gov. Br. at 16–

17.  Commerce's analysis, which ultimately focuses on the petition's language regarding a

chests' ability to store clothing, either ignores, or fails to address, Ethan Allen's argument

regarding the different decorative finishes of each of the three chests.  Ethan Allen Br. at 15–16

(noting that the Marlene has a "careworn, markedly textured finish," the Nadine has "antiqued

silver-leaf or Raven black finishes," and the Serpentine has a "black crackle canvas.").

Moreover, as in Legacy Classic Furniture, Inc. v. United States, Commerce's reasoning, which

inexplicably places more emphasis on the storage ability rather than the decorative aspects of the

three chests, "could be employed to opposite effect."  See 807 F. Supp. 2d 1353, 1359 (CIT

2011) (finding that Commerce unlawfully determined that a storage bench was more similar to

an in-scope bedroom chest than an out-of-scope bench, even though the storage bench had key

features of both).

The court also agrees with AFMC's argument that the ability to hold clothing is a

relevant factor for Commerce to consider, but should not be the dispositive factor.  See AFMC

Br. at 13–14.  For example, simply because a wooden basket shoved under a bed is capable of

storing clothing, this fact alone does not make the basket subject WBF.  Instead, as AFMC notes,

the proper inquiry should focus on the intended function of the product, i.e., whether it was

intended and designed for use in the bedroom,[3] as opposed to whether it is theoretically capable

of storing clothing.  See id. at 14.  Because the Marlene, Nadine, and Serpentine chests have

qualities of both a wooden bedroom chest (ability to store clothing) and of a wooden living room

chest (decorative), Commerce failed to account for record evidence that weighed against its

conclusion.  On remand, because the (k)(1) factors are non-dispositive, Commerce should

evaluate the (k)(2) factors consistent with this decision.

---

[3] In this respect, Commerce might consider the shape and dimensions of the drawers.

### III.   The Vivica Chest

Regarding the Vivica chest, Ethan Allen again argues that it does not meet the threshold requirements for WBF, as it was not designed, manufactured, or offered for sale as part of a coordinated bedroom group.  Ethan Allen Br. at 23.  Ethan Allen urges that the record evidence shows that it was actually designed, manufactured, and offered for sale as part of a three-piece living room group.  Id.  Moreover, Ethan Allen argues that the WBF Order's "generally, but not exclusively" language "does not act to make the general requirements for 'wooden bedroom furniture' superfluous."  Id. at 18.

The government makes the same argument regarding the "threshold" features of WBF, asserting that Commerce reasonably interpreted the scope of the WBF Order to include pieces that are not part of a coordinated bedroom group.  See Gov. Br. at 15–18.  Commerce based its determination that the (k)(1) factors alone were not dispositive on its analysis that the Vivica chest "is a chest of drawers [that] has a design consistent with bedroom chests that serve as storage for clothing . . . [and is] designed with a mirrored surface and features which it shared with other furniture in [a] living room set."  Remand Results at 10.

Commerce improperly determined that the (k)(1) factors are non-dispositive because the (k)(1) factors show that Ethan Allen's Vivica chest is non-bedroom furniture.  Admittedly, the WBF Order defines an in-scope chest of drawers as "typically a case containing drawers for storing clothing."  WBF Order at 332 n.4.  The sources in the (k)(1) factors also explain that "wooden bedroom furniture is generally, but not exclusively, designed, manufactured, and offered for sale in coordinated groups, or bedrooms, in which all of the individual pieces are of approximately the same style and approximately the same material and/or finish."  Id. at 332.  They also provide that WBF "are, overwhelmingly, designed, manufactured, and sold as suites

. . . the ultimate consumer typically sees these products as integrally-related products to be put to integrally-related uses." WBF Petition at 21 (emphasis added). Although the order's "generally, but not exclusively" language creates an exception that includes within the scope some stand-alone furniture, the petition makes clear that this exception is narrow. Not only is the Vivica chest not a part of a coordinated bedroom set, it is, in fact, part of a coordinated living room (i.e., non-bedroom) set and shares "antiquated mirrored glass surfaces, angled framing and wood molded top frames with distinctive mitered molding surrounding the top" with a coffee table and a sofa table. Scope Ruling Request at 2–3.

Commerce, instead, improperly relied on the Vivica chest's potential ability to store clothing. The WBF Order specifically excludes "other non-bedroom furniture," WBF Order at 332–33, and the petition provides living room chests as an example of such non-bedroom furniture, WBF Petition at 21 (noting that living room chests "are usually much more decorative . . . and are typically not as deep as bedroom chests (because the primary purpose of bedroom chests, unlike living room chests, is for storage)"). Commerce attempts to discredit the petition's language when it states that it did "not believe the Petitioner's description of living room chests in the Petition provided useful criteria for distinguishing living room chests from bedroom chests such that the Petitioner's description is dispositive of the matter." Remand Results at 9. Even if Commerce's rejection of the petition language and Ethan Allen's arguments about the decorative aspects of the Vivica chest are proper, Commerce still fails to consider that the Vivica chest is part of a coordinated living room set, which is designed for use in the living room.[4] Indeed, the petition itself defines bedroom furniture with reference to its "intended use in a bedroom." WBF

---

[4] Fleeting advertisements suggesting a dual use are insufficient to make a decorative chest that is part of a living room set bedroom furniture.

Petition at 20.  The Vivica chest's coordinated design in a living room set indicates that its

intended use is in a living room, not a bedroom.  Moreover, as the court has recognized,

"[u]nequivocal exclusions are not loopholes; they are argued for and intentionally omitted from

the scope."  Legacy Classic Furniture, Inc. v. United States, 867 F. Supp. 2d 1321, 1330 (CIT

2012) (citing Wheatland Tube Co. v. United States, 161 F.3d 1365, 1371 (Fed. Cir. 1998)).  The

exclusion of "other non-bedroom furniture" from the scope of the WBF Order makes clear the

order's intent to omit from the scope other non-bedroom furniture, such as living room furniture.

It is inconsistent with the WBF Order to read the narrow exception found in the "generally, but

not exclusively" language to be so broad as to include coordinated living room furniture.  Thus,

because the (k)(1) factors are dispositive as to the Vivica chest and demonstrate that the Vivica

chest is not within the scope of the WBF Order, the court does not proceed to an analysis of the

(k)(2) factors and remands to Commerce to issue a ruling consistent with this opinion.

## IV.     Suspension of Liquidation[5]

Ethan Allen also contests Commerce's liquidation instructions to Customs as

impermissibly having retroactive effect. Ethan Allen Br. at 27–34. To arrive at this conclusion,

Ethan Allen argues that the scope of the WBF Order is unclear and Commerce's Scope Ruling

required an analysis of the (k)(1) and (k)(2) factors to clarify the scope. Id. at 29–34; see Reply

in Supp. of Pl. Ethan Allen Operations, Inc.'s Rule 56.2 Mot. for J. on the Agency R. 7–11, ECF

No. 41 ("Ethan Allen Reply") (arguing that "the retroactivity issue is triggered" whenever

Commerce conducts a (k)(1) or (k)(2) analysis). Ethan Allen also argues that its accent chests

were not previously subject to suspension of liquidation under the allegedly unclear scope

contained in the WBF Order.[6] Ethan Allen Br. at 29, 34; Ethan Allen Reply at 5–6. As a result,

Ethan Allen believes that Commerce's liquidation instructions to assess duties on in-scope

---

[5] At the outset, the court notes that none of the parties in their briefs raised the question of whether the court has jurisdiction over this claim. Nevertheless, "a court has an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." Ford Motor Co. v. United States, 992 F. Supp. 2d 1346, 1354 (CIT 2014) (internal quotations omitted) (quoting Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006)). Ethan Allen asserts that the court has jurisdiction over the entire appeal under 28 U.S.C. § 1581(c). Ethan Allen Br. at 12. Although jurisdiction over a party's challenge to Commerce's liquidation instructions may sometimes be proper under 28 U.S.C. § 1581(i), jurisdiction under § 1581(i) is residual and may only be employed where a party has no remedies under subsections (a) through (h) of that section. Duferco Steel, Inc. v. United States, 29 CIT 1249, 1253, 403 F. Supp. 2d 1281, 1285 (2005). Instead, Ethan Allen's challenge to Commerce's liquidation instructions directly stem from Ethan Allen's claim that the Scope Ruling and Remand Results were unlawful. And, Commerce's Remand Results specifically address the issue of suspension of liquidation, indicating that a § 1581(c) challenge may be the proper method to challenge not only the Scope Ruling and Remand Results, but also the liquidation instructions deriving therefrom. Accordingly, the court has, at least, a colorable claim of jurisdiction under § 1581(c).

[6] The parties could not clarify at oral argument whether suspension and collection of duty deposits actually occurred and for which set of entries. If the liquidation was not suspended, it was likely because Ethan Allen did not declare the chests to be bedroom furniture subject to an antidumping duty order.

merchandise from a time prior to the commencement of the scope inquiry were not permissible

under 19 C.F.R. § 351.225(l)(1).[7] Ethan Allen Br. at 34–36.

The government responds that Commerce's liquidation instructions were lawful. Gov.

Br. at 25–33. The government argues that Ethan Allen improperly relies on the Federal Circuit's

holding in AMS Assocs., Inc. v. United States, 737 F.3d 1338 (Fed. Cir. 2013), arguing instead

that the scope of the WBF Order was sufficiently clear. Gov. Br. at 28–33. The government also

disagrees with Ethan Allen's argument that Commerce's Scope Ruling constituted a

"clarification" which expanded the scope of the WBF Order. Id. at 31. Instead, the government

argues Commerce simply confirmed that Ethan Allen's chests were subject to the WBF Order.

Id. at 31–33.

AFMC asserts that "bedroom chests are unambiguously included in the scope of the

Order," but acknowledges that whether particular chest should be classified as bedroom furniture

or living room furniture will require an analysis "of the purpose and use of the chest." AFMC

Br. at 18. It contends that any importer of chests designed, marketed, and offered for sale might

try to argue that an ambiguity exists as to the purpose and use of such chests to avoid duties,

which is not the result intended by the Federal Circuit in AMS. Id.

---

[7] The regulation provides:

> When [Commerce] conducts a scope inquiry under paragraph (b) or (e) of this section, and the product in question is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or a final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order.

19 C.F.R. § 351.225(l)(1) (emphasis added).

When Commerce issues a preliminary scope ruling determining "that the product in question is included within the scope of the order, [then] any suspension of liquidation . . . will continue." 19 C.F.R. § 351.225(l)(2). "If liquidation [for the product in question] has not been suspended," however, Commerce may only suspend liquidation and collect cash deposits from "on or after the date of initiation of the scope inquiry." Id. The same rules apply to the final scope ruling at issue here. 19 C.F.R. § 351.225(l)(3).

In interpreting the lawfulness of Commerce's liquidation instructions, both parties cite to AMS, and Ugine & ALZ Belgium v. United States, 551 F.3d 1339 (Fed. Cir. 2009).[8] In AMS, the laminated woven sacks ("LWS") at issue were not already subject to suspension of liquidation because of a prior Customs country of origin ruling, which found that sacks made of non-Chinese-origin fabric were not Chinese. 737 F.3d at 1340. There, Commerce expanded the scope from the previous understanding by ruling that under the substantial transformation test, LWS made from non-Chinese-origin fabric are considered Chinese for scope purposes. Id. at 1340–41, 1344. Thus, a conscious change in governmental decisions applicable to the antidumping duty order occurred. AMS and 19 C.F.R. § 351.225 on their face, however, indicate without limitation that if there was not an actual suspension of liquidation in place and Commerce determines pursuant to a formal scope proceeding under that section to include certain merchandise in the scope of the order, the suspension and collection of duty deposits will be retroactive only to the commencement of the scope proceeding.

---

[8] Whether the court directly confronted the retroactivity issue in Ugine is not clear as the court ultimately disagreed with Commerce on the merits and found the merchandise outside the scope of the order.

Whatever occurred in this case, it is fair to say there is a genuine dispute as to whether

the four chests at issue are within the scope of the order.  It is possible that the retroactivity issue

will be mooted, that is, all the chests may be found to be outside the scope.  Thus, the court need

not finally resolve this, but it will require further facts, including information about Customs'

treatment of Ethan Allen's chests subsequent to entry, before it decides whether relief is

warranted.

Accordingly, Ethan Allen shall complete the record by establishing what Customs did

upon receipt of Commerce's original instruction with respect to the merchandise.  Ethan Allen,

in particular, should submit information to Commerce as to whether or not there are live entries

within a period in which there was no actual suspension of liquidation by Customs.  On remand,

Commerce should consider this newly submitted entry information to help evaluate whether

Commerce's post-scope inquiry liquidation instructions were proper.

### CONCLUSION

For the foregoing reasons, Commerce's Scope Ruling and Remand Results are remanded

for Commerce to reconsider its decision regarding Ethan Allen's Marlene, Nadine, and

Serpentine chests pursuant to the (k)(2) factors, and for Commerce to issue a determination

consistent with this opinion regarding the Vivica chest.  Commerce should reconsider its

liquidation instructions as necessary.  Commerce shall have until February 1, 2016, to file its

remand results.  The parties shall have until March 2, 2016, to file objections, and the

government shall have until March 16, 2016, to file its response.


                                                                          /s/ Jane A. Restani
Dated: December 1, 2015                                          Jane A. Restani
          New York, New York                                         Judge